

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

**U.S. Department of Justice**

2012 DEC 10 P 2: 56

CLERK *United States Attorney*
AT BA*District of Maryland*
*Northern Division*
BY_____ DEPUTY

---

*Rod J. Rosenstein*
*United States Attorney*

*David I. Sharfstein*
*Assistant United States Attorney*

*36 South Charles Street*
*Fourth Floor*
*Baltimore, Maryland 21201*

*DIRECT: 410-209-4991*
*MAIN: 410-209-4800*
*FAX: 410-962-3091*
*TTY/TDD: 410-962-4462*

November 27, 2012

Caroline D. Ciraolo
Rosenberg | Martin | Greenberg, LLP
25 South Charles Street, 21st Floor
Baltimore, Maryland 21201

Re:   Plea Agreement for Salvatore A. Petti  JFM-12-0621

Dear Ms. Ciraolo:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by November 29, 2012, it will be deemed withdrawn. The terms of the agreement are as follows:

<u>Offense of Conviction</u>

1.      The defendant agrees to waive indictment and plead guilty to a Criminal Information which will charge him with one count of wire fraud, in violation of 18 U.S.C. § 1343, and one count of tax evasion, in violation of 26 U.S.C. § 7201. The defendant admits that he is, in fact, guilty of these offenses and will so advise the Court.

<u>Elements of the Offense</u>

2.      The elements of the offenses to which the defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

Revised 11/5/09

Wire Fraud (Count One):

(1)     The defendant devised or intended to devise a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises;

(2)     The defendant knowingly and willfully acted with an intent to defraud; and

(3)     The defendant used, or caused to be used, interstate wire communications in furtherance of the scheme.

Tax Evasion (Count Two)

(1)     The defendant owed a substantial income tax liability;

(2)     The defendant attempted to evade or defeat the payment of that tax in any manner; and

(3)     The defendant did so willfully.

<u>Penalties</u>

3.     The maximum sentences provided by statute for the offenses to which the defendant is pleading guilty are as follows:

Wire Fraud (Count One) — 20 years imprisonment, 3 years of supervised release, a $250,000 fine, and a $100 special assessment; and

Tax Evasion (Count Two) — 5 years imprisonment, 3 years of supervised release, a $100,000 fine, and a $100 special assessment.

The Court will also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked— even on the last day of the term—and the defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The defendant understands that the Bureau of Prisons has

_____

[1]     Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

sole discretion in designating the institution at which the defendant will serve any term of imprisonment imposed.

### Waiver of Rights

4.    The defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a.    The defendant has a right to have his case presented to a grand jury who would determine whether there is probable cause to charge him. By agreeing to proceed by Information, the defendant gives up the right to have the grand jury consider whether there is probable cause.

b.    If the defendant had pled not guilty to the charges, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the defendant, this Office, and the Court all agreed.

c.    If the defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the defendant could be found guilty of any count. The jury would be instructed that the defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

d.    If the defendant went to trial, the government would have the burden of proving the defendant guilty beyond a reasonable doubt. The defendant would have the right to confront and cross-examine the government's witnesses. The defendant would not have to present any defense witnesses or evidence whatsoever. If the defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

e.    The defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

f.    If the defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

3

g.      By pleading guilty, the defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

h.      If the Court accepts the defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

i.      By pleading guilty, the defendant will also be giving up certain valuable civil rights, such as the right to vote, own a firearm, or hold public office. The defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status, including deportation.

### Advisory Sentencing Guidelines Apply

5.      The defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

6.      This Office and the defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors.

a.      The parties stipulate that the provisions of U.S.S.G. § 2B1.1 apply to the defendant's offense in Count One. The parties further agree that the following provisions apply:

(1)      The base offense level for the defendant's conduct is **7** pursuant to U.S.S.G. § 2B1.1(a);

(2)      The loss figure attributable to Count One is greater than $200,000 but less than $400,000, resulting in a **12 level increase** under U.S.S.G. § 2B1.1(b)(1)(G);

(3)      The defendant abused a position of trust and used a special

4

skill in a manner that significantly facilitated the commission or concealment of the offense, resulting in a **2 level increase** pursuant to U.S.S.G. § 3B1.3; and

        (4)     The adjusted offense level for Count One is **21**.

        b.     The parties stipulate that the provisions of U.S.S.G. § 2T1.1 apply to the defendant's offense in Count Two.  The parties further agree that the following provisions apply:

        (1)     Including relevant conduct under U.S.S.G. § 1B1.3, the tax loss resulting from the defendant's conduct is greater than $200,000 but less than $400,000, resulting in a base offense level of **18**, pursuant to U.S.S.G. § 2T1.1(a) and U.S.S.G. § 2T4.1;

        (2)     The defendant failed to report the source of income exceeding $10,000 in any year resulting from criminal activity, resulting in a **2 level increase** pursuant to U.S.S.G. § 2T1.1(b)(1); and

        (3)     The adjusted offense level for Count ~~One~~ *Two* is **20**.

        c.     If Counts One and Two group under U.S.S.G. § 3D1.2, the adjusted offense level in this case is **21**.

        d.     This Office may argue at sentencing, however, that the offenses in Count One and Count Two do not group under U.S.S.G. § 3D1.2 because the offenses involve different loss calculations, victims, and courses of conduct.  Under U.S.S.G. § 3D1.4(a), Count One is the group with the highest offense level at **21** and therefore constitutes one "Unit."  The offense level for Count Two is **20**, which results in an additional "Unit," resulting in a total of two "Units."  If the Court finds that Counts One and Two do not group, an additional **2 levels** are added to the first "Unit" under U.S.S.G. § 3D1.4, which would result in an adjusted offense level of **23**.

        e.     This Office does not oppose a **two-level reduction** in the defendant's adjusted offense level, based upon the defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct.  This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an **additional one-level decrease** in recognition of the defendant's timely notification of his intention to plead guilty. This Office may oppose *any* adjustment for acceptance of responsibility if the defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

f.      This Office and the defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.  The defendant reserves the right to argue for a sentence below the sentencing guidelines range under 18 U.S.C. § 3553(a).

<u>Obligations of This Office</u>

7.      This Office agrees that, other than the charges contained in the Criminal Information addressed in Paragraph 1, it will not file any additional criminal tax charges relating to the tax years 1998 through 2009, nor will it file any additional criminal charges related to the defendant's embezzlement of funds from the EAA so long as the embezzlement does not exceed the amount of $416,134.  This Office agrees to recommend a term of imprisonment within the guidelines range, but will wait until it reviews the presentence report before determining its specific recommendation with the guidelines range.

<u>Forfeiture</u>

8.      The defendant understands that the Court will, upon acceptance of his guilty plea, enter an order of forfeiture as part of his sentence, and that the order will only include the funds and assets specifically set forth in this paragraph.  Subject to the exception contained in paragraph fourteen, this Office agrees not to seek additional forfeiture against the defendant for the conduct covered by this plea agreement.  Specifically, as a consequence of the defendant's plea of guilty to Count One, which charges him with wire fraud in violation of 18 U.S.C. § 1343, the Court will order at sentencing the forfeiture of the following items:

a.      The proceeds contained in the defendant's Individual Retirement Arrangement at Liberty Financial, account number xx7941, estimated at $56,000;

b.      $4,000 from Howard Bank, account number xxx2372;

c.      The proceeds from a bank account at Howard Bank, account number xxx9822, estimated at $10,000;

d.      The proceeds from a money market account at Howard Bank, account number xxx0189, estimated at $1,150;

e.      The proceeds received by the defendant's sale of a personal seat license for the Baltimore Ravens, estimated at $4,000; and

f.      The proceeds received by the defendant's sale of three Marriott timeshares, identified as GV*3502*35*B, GV*7108*41*B, and GV*1016*19*B, worth approximately $12,000.

6

9.      The defendant represents that the values listed for the items above represent good faith estimates as of October 9, 2012, and that the defendant has not taken any action to transfer or dissipate these funds or assets since the estimate was provided to this Office. Beginning on the date of the execution of this agreement, the defendant agrees not to transfer or dissipate the funds listed in (a), (b), (c), and (d). The defendant further agrees to make every reasonable attempt to sell the assets listed in (e) and (f) for the estimated price listed above.

10.      The defendant represents that with the exception of liens held by financial institutions and the interests of his wife, Joanna Petti, he is unaware of any third-party interest in any of the specific assets that he has agreed to forfeit. The defendant also understands that Joanni Petti will withdraw her claim of ownership and waive any further claim of entitlement to the funds and assets listed in (a) through (f) above. The defendant also agrees that he will not assist any third party, including his spouse and family members, in asserting a claim to the forfeited assets in an ancillary proceeding and that he will testify truthfully in any such proceeding.

11.      The defendant agrees to bring the funds listed in (a) through (d) above, as well as the proceeds obtained from the sale of the property listed in (e) and (f), with him at the time of sentencing in the form of a certified check made payable to:

> Felicia C. Cannon, Clerk of Court
> United States District Court for the District of Maryland
> Baltimore Division
> 101 W. Lombard Street
> Baltimore, MD 21201

If, despite good faith efforts, the property listed in (e) and (f) have not been sold at the time of sentencing, the defendant agrees to relinquish control of the assets to the Government or make other reasonable accommodations with respect to these assets to expedite the sale of these assets and remittance of the sale proceeds to the Government, including, if the Government directs, transfer of title to the assets to the Government.

12.      The defendant agrees to consent to the entry of orders of forfeiture for the above-listed property funds and assets and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

<u>Assisting the Government with Regard to Forfeiture</u>

13.      The defendant agrees to assist fully in the forfeiture of the foregoing assets. As part of this assistance:

7

        a.      The defendant agrees to disclose to this Office all of his assets and sources of income.

        b.      The defendant agrees to disclose to this Office all financial accounts over which he or his wife, Joanna Petti, have had any control or signatory authority in from September 2010 to the present. At this Office's request, the defendant also agrees to provide this Office with account statements for any such accounts.

        c.      The defendant agrees to take all steps necessary to pass clear title to the forfeited assets to the United States, including but not limited to executing any and all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are not sold, disbursed, wasted, hidden or otherwise made unavailable for forfeiture.

        d.      The defendant agrees to give this Office permission to request and review his federal and state income tax returns, and any credit reports maintained by any consumer credit reporting entity, until such time as the money judgment is satisfied. In this regard, the defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) as well as whatever disclosure form may be required by any credit reporting entity.

        14.      If this Office determines that the defendant has intentionally failed to disclose the existence of any asset, including any account over which he or his wife, Joanna Petti, have had any control or signatory authority since September 2010, or if this Office determines that the defendant has transferred or dissipated the funds in any such account for the purpose of avoiding full payment of forfeiture or restitution to the United States in connection with this matter, then this Office will be relieved of its obligations to the defendant as reflected in the forfeiture section of this agreement. Specifically, this Office may seek to forfeit additional funds or property of the defendant, even if such funds or property are not specifically outlined in this plea agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the defendant's breach by a preponderance of the evidence.

### Waiver of Further Review of Forfeiture

        15.      The defendant further agrees to waive all constitutional, legal and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The defendant also agrees not to challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this agreement, and will not assist any third party with regard to such challenge or review or with regard to the filing of a petition for remission of forfeiture.

### Restitution to the Employee's Activities Association

16.    The defendant agrees to the entry of a Restitution Order in the amount of $299,724 as a result of the defendant's embezzlement of funds from the Employee's Activities Association ("EAA"). The defendant agrees that, pursuant to 18 U.S.C. §§ 3663, 3663A, 3563(b)(2), and 3583(d), the Court may order restitution to the EAA in the amount of $299,724.

17.    This Office will recommend that the Attorney General apply forfeited funds to satisfy the restitution amount owed to the Employee's Activities Association.

### Restitution to the Internal Revenue Service

18.    The defendant agrees to pay restitution to the Internal Revenue Service ("IRS") in the total amount of $270,769 as a result of the defendant's failure to pay taxes to the IRS for years 1998 through 2009. As shown in the following chart, this amount represents the tax loss for tax years 1998 through 2009. The defendant agrees that, pursuant to 18 U.S.C. §§ 3663, 3663A, 3563(b)(2), and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation.

| Tax Year | Tax Loss |
|----------|----------|
| 1998 | $13,720 |
| 1999 | $13,987 |
| 2000 | $13,589 |
| 2001 | $14,634 |
| 2002 | $12,897 |
| 2003 | $12,855 |
| 2004 | $14,832 |
| 2005 | $50,328 |
| 2006 | $37,397 |
| 2007 | $38,330 |
| 2008 | $36,102 |
| 2009 | $12,098 |
| **Total** | **$270,769** |

19.    When the Court orders the defendant to pay restitution to the IRS for the

failure to pay tax, either directly as part of the sentence or as a condition of supervised release, the IRS will use the restitution order as the basis for a civil assessment. See 26 U.S.C. § 6201(a)(4). The defendant does not have the right to challenge the amount of this assessment. See 26 U.S.C. § 6201(a)(4)(C). Although the defendant does not have the right to challenge the amount of this assessment, this Office will request an amendment of the restitution order if the IRS independently determines, pursuant to examination, that the restitution amount ordered is excessive, and if the IRS contacts this Office to request a modification of the restitution order. Neither the existence of a restitution payment schedule nor the defendant's timely payment of restitution according to that schedule will preclude the IRS from administrative collection of the restitution-based assessment, including levy and distraint under 26 U.S.C. § 6331.

20.     The defendant agrees that this agreement, or any judgment, order, release, or satisfaction issued in connection with this agreement, will not satisfy, settle, or compromise the defendant's obligation to pay the balance of any remaining civil liabilities, including tax, additional tax, additions to tax, interest, and penalties, owed to the IRS for the time periods covered by this agreement or any other time period.

Restitution – General

21.     The defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited, to copies of all relevant bank and financial records, regarding the current location and prior disposition of funds obtained as a result of the criminal conduct set forth in the factual stipulation. The defendant agrees to meet all payment obligations established by the Court with respect to restitution based on the defendant's complete and accurate disclosure of his income and assets. If the defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

Waiver of Appeal

22.     In exchange for the concessions made by this Office and the defendant in this plea agreement, this Office and the defendant waive their rights to appeal as follows:

a)     The defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

b)     The defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows: (i)

10

the defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds the advisory guideline range determined by the Court; (ii) and this Office reserves the right to appeal any term of imprisonment to the extent that it falls below the advisory guideline range determined by the Court.

c)    Nothing in this agreement shall be construed to prevent the defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

d)    The defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Obstruction or Other Violations of Law

23.    The defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Court Not a Party

24.    The defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to

and including the statutory maximum stated above. The defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the defendant will receive. The defendant agrees that no one has made such a binding prediction or promise.

Entire Agreement

25.    This letter supersedes any prior understandings, promises, or conditions between this Office and the defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the defendant fully accepts each and every term and condition of this agreement, please sign and have the defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By: _____
David I. Sharfstein
Assistant United States Attorney

12

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

_11/29/2012_
Date

_Salvatore A. Petti_
Salvatore A. Petti

I am Salvatore A. Petti's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

_11/29/2012_
Date

_Caroline D. Ciraolo_
Caroline D. Ciraolo

13

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2012 DEC 10  P 2: 56

CLERK'S
OFFICE
AT BALTIMORE

BY_____DEPUTY

**ATTACHMENT A:  Factual Stipulation – Salvatore A. Petti**

*The parties hereby stipulate and agree that had this matter gone to trial, the government would have proven the following facts through competent evidence beyond a reasonable doubt. The parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter gone to trial.*

## I.    Background

1.     Salvatore A. Petti ("Petti") worked for the Social Security Administration ("SSA") for more than 40 years, ultimately reaching general schedule ("GS") level 15.  He retired from the SSA in 1995.  Petti also served as the Treasurer for the Employees Activities Association ("EAA") of the SSA, which was located in the SSA building in Woodlawn, Maryland.

2.     The EAA was established in 1966 to provide social, recreational, cultural, welfare, health, and athletic activities for its members, the employees of the SSA.  EAA was comprised of multiple organizations, including two for-profit entities, EAA Service Centers, Inc. and EAA Service Corporation, Inc., and three non-profit entities, SSA Community Scholarship Fund, Inc., EAA Fitness, Inc., and EAA/SSA Secur-A-Kiddie Center, Inc.

3.     As the Treasurer of the EAA, Petti was responsible for handling its financial affairs, including the entities within its corporate umbrella.  His responsibilities included maintaining the EAA's books and records and issuing Forms 1099 to EAA contractors.

4.     Petti was also responsible for coordinating with Glass Jacobson, the outside accounting firm that was hired to perform certain accounting and tax preparation services for the EAA.  Petti was responsible for preparing, and in fact did prepare, monthly and annual reports that were used to prepare EAA's financial statements and tax returns.  Petti was aware that Glass Jacobson conducted a full audit on the three non-profit EAA entities.  Petti was also aware that Glass Jacobson did not perform a full audit on the two for-profit EAA entities.  For the for-profit entities, Petti knew that Glass Jacobson would only create financial statements for EAA using the accounting information provided to the firm by Petti.

4.     Between 2005 and 2008, Petti was authorized to earn approximately $60,000 in annual salary from the EAA.  Petti knew that the checks he received as salary payments were properly classified as "accounting expenses" in the EAA accounting system which he maintained.

## II.    False Forms 1040

5.     In 2009, the SSA Office of Inspector General ("SSA OIG") began an audit of the EAA at the request of Senator Charles Grassley.  Petti was responsible for

-1-

responding to SSA OIG's requests for documents. On or about December 16, 2009, Petti was questioned by SSA OIG auditors about his role at the EAA and the salary he earned from the EAA. On or about February 24, 2010, during a meeting with SSA OIG auditors, the SSA OIG auditors informed Petti that they had discovered that he had not reported any income to the IRS between 2006 and 2008. The auditors also informed Petti that this information would be reported to the IRS.

6.     Indeed, by February 2009, Petti had not reported to the IRS any income earned from the EAA from at least 1998 through 2009. Although Petti had not reported any of his EAA income from 1998 to 2009, he timely filed a tax return, Form 1040, each year under the "married filing jointly" filing status. On these tax returns, Petti reported all other relevant financial information, including, among other items, interest income, ordinary dividends, capital gains and losses, supplemental income and loss, charitable contributions, and gambling income and losses. Because he did not report any income he earned from EAA, Petti's tax returns from 1998 to 2009 were false.

7.     Petti was able to evade paying taxes on his authorized salary from EAA by classifying himself as an independent contractor, when he in fact knew that he should have been classified as an employee. Unlike other employees of EAA, who had income, Social Security, and Medicare taxes withheld from their paychecks, Petti did not have any such taxes withheld from his authorized income.

8.     In his role as Treasurer, Petti knew that, as an "independent contractor," he was responsible for issuing himself a Form 1099 on behalf of the EAA. Indeed, Petti was responsible for issuing, and in fact did issue, Forms 1099 to the other independent contractors hired by EAA during his time as Treasurer. Petti was also responsible for sending the Forms 1099 to the IRS. Nonetheless, Petti did not issue himself a Form 1099, he did not send the IRS a Form 1099 showing the income he received, and he did not report his EAA income to the IRS when he filed his false tax returns.

9.     Prior to the SSA OIG audit, Petti had never disclosed to anyone at EAA, including coworkers and the Board of Directors, that he was not issuing himself a Form 1099 or paying any taxes on his EAA income.

10.    As discussed below, Petti's 2005 through 2009 tax returns were also false because he failed to report the unauthorized income he took from the EAA during these years.

11.    The final SSA OIG audit report, which was released on May 7, 2010, found that "the EAA treasurer recorded all journal, cash disbursement, and general ledger entries, and performed bank reconciliations for nearly all EAA entities."

12.    The report also concluded as follows: "Unlike other compensated staff, EAA classified one worker as an 'independent contractor' and did not withhold or pay income, Social

Security, or Medicare taxes on a significant amount of compensation paid to the worker . . . . We requested EAA provide all Forms 1099 issued during the audit period. We reviewed available documents and found nothing to indicate that EAA reported the independent contractor's compensation to the IRS . . . . [T]his situation potentially exposes not only the worker, but also EAA, to significant tax liability, penalties, and interest. To address this situation, we forwarded pertinent information to the IRS." Petti was the "independent contractor" referred to in the report.

## III.   False Forms 1040X

13.    Between March 6, 2010 and March 31, 2010, after he learned that the SSA OIG discovered his unreported income, and before the final SSA OIG audit report was publicly released on May 7, 2010, Petti filed a second round of false tax returns. Specifically, Petti filed amended tax returns, Forms 1040X, with the IRS for the years 2006 through 2009, again under the "married filing jointly" filing status. On these tax returns, Petti only reported the income he was authorized to receive from the EAA, which had been discovered by the SSA OIG auditors and reported to the IRS. Petti reported that his income from the EAA was $64,700 in 2006, $63,125 in 2007, $62,475 in 2008, and $52,980 in 2009.

14.    On these Forms 1040X, Petti included false expenses on the attached Schedules C which had the effect of reducing the taxes he owed to the IRS on his reported income. Specifically, Petti falsely claimed on these Forms 1040X that he incurred substantial personal expenses associated with his work as Treasurer of EAA, such as "office expenses," "supplies," "travel," and "utilities." In total, Petti claimed false Schedule C expenses of $24,986 in 2006, $24,102 in 2007, $25,723 in 2008, and $26,166 in 2009.

15.    As discussed below, Petti again failed to disclose the unauthorized income he took from the EAA on these amended tax returns.

## IV.   Wire Fraud

16.    Unbeknownst to the EAA and the SSA OIG, Petti was also embezzling substantial funds from the EAA on top of the authorized salary he was entitled to receive.

17.    Between 2005 and 2009, Petti was properly classifying some checks he issued to himself as "accounting expenses" in the EAA accounting system which he maintained. These checks constituted Petti's authorized salary from EAA. In addition, however, Petti was also improperly classifying other checks issued to himself in other accounting classifications, such as "administrative expense" and "general expenses." By doing so, Petti was able to hide approximately $416,000 of unauthorized payments to himself between 2005 and 2009. The approximate total payments Petti made to himself using EAA funds are shown in the following chart:

| Year | Amount of Checks Classified as Accounting Expenses | Amount of Checks Classified in a Different Accounting Category | TOTAL |
|---|---|---|---|
| 2005 | $61,600 | $98,205 | $159,805 |
| 2006 | $67,075 | $96,184 | $163,259 |
| 2007 | $63,325 | $101,125 | $164,450 |
| 2008 | $62,975 | $95,650 | $158,625 |
| 2009 | $31,700 | $24,970 | $56,670 |
| TOTAL | $286,675 | $416,134 | $702,809 |

18.     Petti did not report the $416,134 of additional, unauthorized income on either his original tax returns for years 2005 through 2009 or on his amended tax returns in 2006 through 2009.

19.     By misclassifying the additional, unauthorized income in the accounting records, Petti was able to hide ths income from the EAA and the SSA OIG.

20.     Petti was also able to hide this additional unauthorized income from the outside accounting firm of Glass Jacobson.  EAA maintained bank accounts at 1st Mariner Bank for its for-profit and non-profit entities, and Petti had signatory authority over these accounts.  Because Petti knew that Glass Jacobson conducted a full annual audit of the non-profit entities but not the for-profit entities, Petti issued the checks to himself from the for-profit entities' bank accounts in order to hide the unauthorized income from Glass Jacobson.

21.     By issuing checks from EAA bank accounts maintained at the 1st Mariner Bank, and by depositing the checks into his Wachovia Bank Account, Petti caused funds to be transferred electronically using the interstate wires.

*  *  *  *  *

-4-

I have read this statement of facts, and carefully reviewed it with my attorney. I acknowledge that it is true and correct.

_11/29/2012_
Date

Salvatore A. Petti

I am Salvatore A. Petti's attorney. I have carefully reviewed the statement of facts with him.

_11/29/2012_
Date

Caroline D. Ciraolo

-5-